UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRITTANY DAVIS,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>STATE UNIVERSITY OF NEW YORK, STONY BROOK UNIVERSITY MEDICINE, LONG ISLAND PLASTIC SURGICAL GROUP, P.C., NASSAU HEALTH CARE CORPORATION AND NASSAU UNIVERSITY MEDICAL CENTER,<br><br>　　　　　Defendants. | Case No.:<br><br>**COMPLAINT**<br><br><br>PLAINTIFF DEMANDS<br><br>A TRIAL BY JURY |

Plaintiff, BRITTANY DAVIS, (hereinafter "Plaintiff"), by her attorneys, MESIDOR PLLC, Attorneys at law, hereby complains of Defendants, STATE UNIVERSITY OF NEW YORK STONY BROOK UNIVERSITY MEDICINE, LONG ISLAND PLASTIC SURGICAL GROUP, and NASSAU HEALTH CARE CORPORATION / NASSAU UNIVERSITY MEDICAL CENTER, upon information and belief as follows:

### NATURE OF THE CASE

1. Plaintiff complains pursuant to **Title VII of the Civil Rights Act of 1964**, as amended, 42 U.S.C. § 2000e *et. seq.* ("Title VII"), **Title IX of the Education Amendments of 1972 ("Title IX"),** and the **New York State Human Rights Law**, (New York State Executive Law § 296, *et seq.*) ("NYSHRL"), seeking damages to redress the injuries she has suffered as a result of being **discriminated and sexually harassed** and **retaliated** against based on her sex/gender and for reporting her sexual harasser.

### JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331, as this action arises under 42 U.S.C. §2000(e), et seq.

3. The Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. §1367.

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the actions or omissions giving rise to the claims, occurred within this judicial district.

## PROCEDURAL PREREQUISITES

5. Plaintiff filed a charge of discrimination against Defendants, upon which this Complaint is based, with the Equal Employment Opportunity Commission ("EEOC").

6. Plaintiff received a Notice of Right to Sue from the EEOC issued on September 30, 2024, with respect to the instant charges of discrimination against Stony Brook University. A copy of the Notice is annexed to this Complaint as Exhibit A.

7. This action is being commenced within 90 days of receipt of the Notice of Right to Sue.

8. Plaintiff received a Notice of Right to Sue from the EEOC issued on December 27, 2024, with respect to the instant charges of discrimination against LIPSG. A copy of the Notice is annexed to this Complaint as Exhibit B.

9. This action is being commenced within 90 days of receipt of the Notice of Right to Sue.

10. Plaintiff received a Notice of Request for Notice of Right to the Sue from the EEOC issued on December 27, 2024, with respect to the instant charges of discrimination against NUMC. A copy of the Notice is annexed to this Complaint as Exhibit C. Plaintiff reserves the right to bring claims against NUMC pursuant to Title VII of the Civil Rights Act of 1964.

## PARTIES

11. At all relevant times herein, Plaintiff is a resident of the State of Tennessee, Hamilton County. At all relevant times, Plaintiff was and is a person and was a prospective

employee of the Program (described below) entitled to protection as defined by the federal and state laws invoked herein.

12. Defendant Nassau Health Care Corporation/Nassau University Medical Center (hereinafter "NUMC") is and was, at all relevant times, a not-for-profit corporation organized under the laws of the State of New York, which operates a hospital located at 2201 Hempstead Turnpike, East Meadow, New York 1155.

13. Defendant State University of New York Stony Brook University Medicine (hereinafter "Stony Brook Medicine" or "Stony Brook") is and was a domestic hospital operated by the State University of New York, which operates a hospital located at 101 Nicolls Road, Stony Brook, New York 11794.

14. Defendant Long Island Plastic Surgical Group, P.C., was a domestic corporation located at 999 Franklin Avenue, Garden City, New York 11530.

## MATERIAL FACTS

15. Plaintiff is an accomplished medical doctor and a graduate of the Donald and Barbara Zucker School of Medicine at Hofstra Northwell.

16. Plaintiff has conducted extensive medical and scientific research at institutions including but not limited to Massachusetts General Hospital, Brown University, Yale University, and Cold Spring Harbor Laboratory. Plaintiff has also co-published several articles in peer-reviewed journals and presented at conferences, symposiums, and other events.

17. Plaintiff completed a general surgery residency in June 2022 at the Stamford Hospital/Columbia University Vagelos College of Physicians and Surgeons.

18. In the fall of 2020, Plaintiff applied for an independent track plastic surgery residency position at a residency program jointly conducted by LIPSG, NUMC, and SUNY Stonybrook (hereinafter "Program" or "LNS Program") as a part of the 2020 – 2021 residency application cycle. This position would have begun in July 2022 (interviews are conducted approximately one year before the position commences).

19. Plaintiff also applied for other "independent tack" plastic surgery residency programs that would begin in or around July 2022.

20. "Independent track" plastic surgery residencies are three-year programs generally available for applicants such as Plaintiff who have already completed a general surgery residency.

21. Applicants apply for independent track residencies through a "match" process.

22. In the late fall during the application cycle, applicants submit a common application to all programs for which they seek interviews. Interviews are offered to applicants by residency programs between the fall and spring.

23. After interviews end in or about late April, applicants rank the programs with which they interviewed, according to their preference. In or about early May, residency programs in turn rank applicants according to their preference.

24. An algorithm matches residents' rank lists with the residency programs' rank lists. The algorithm weighs the residents' rank lists more heavily than those of the residency programs.

25. Once matched with a program, a resident receives an offer from that residency program and no other program.

26. Medical residencies commence approximately fourteen months after the match date (i.e. in July of the calendar year following the match).

27. For the 2020 – 2021 application cycle, Plaintiff applied to the LNS Program, among other residency programs.

28. The LNS program invited Plaintiff for an interview on April 10, 2021. Seven other programs, including a residency program at the University of Alabama, also invited Plaintiff for an interview for a resident position.

29. Plaintiff had strong ties to the Program before applying for a residency position at the Program. In August 2020 Plaintiff successfully completed a one-month away rotation at LIPSG, where she interacted primarily with Dr. Roger Simpson (Director of the Program) and Dr. Pinsky. After completing a one-month rotation at LIPSG, Dr. Simpson wrote one of Plaintiff's letters of recommendation for her plastic surgery residency applications and stated that the Program would be happy to have her as a resident.

30. Further, doctors at the Program expressed that Plaintiff was at the top of the Program's list of residency candidates. For example, Dr. Feras Yamin, a third–year independent resident at the LNS program who Plaintiff met during her rotation at the Program informed Plaintiff that Dr. Simpson and Dr. Rojas indicated that they were "very impressed" with Plaintiff and her application.

31. On April 10, 2021, Plaintiff participated in several interviews with the Program via Zoom. During her last interview of the day, Dr. Elliot Duboys, one of the Program's attendings, sexually harassed her.

32. Among other harassment, Dr. Duboys asked to see her "from the bust down" and indicated that she should stand up so that he could view her chest, torso, and legs.

33. Although the interview began normally, mid-way through the interview Dr. Duboys with a smirk on his face, remarked that it was a shame that he could only see Plaintiff's body from

"the bust up" (due to the virtual interview) and that "hopefully I get to see you from more than just the bust up next time."

34. Plaintiff initially did not respond. Dr. Duboys then insisted stating "I want to see you from the bust down," indicating that he wanted to see Plaintiff stand up and show him her body and legs.

35. Shocked and embarrassed, Plaintiff refused to stand up and hoped that Dr. Duboys would stop reiterating his demands.

36. Plaintiff made several attempts to rebuff Dr. Duboys, including by stating "I'm sorry, I don't understand what you mean" Dr. Duboys persisted and again asked "What do you look like from the torso down? I want to know what you look like from here down" while gesturing to his chest.

37. Plaintiff again deflected by stating "I don't understand the relevance of that to this interview." However, Dr. Duboys continued to harass Plaintiff by leering at her, gesturing from his chest down, and responding, "I'm just curious, I want to know what you look like from here down."

38. Clearly uncomfortable, Plaintiff refused to stand up and stated that she was athletic. In response, Dr. Duboys laughed and replied "I wasn't asking about the waist down, I can't ask that. I want to know what you look like from the bust down." While remaining seated, Plaintiff again deflected and stated that she had won a pizza-eating contest in college so he "could use [his] imagination.

39. After Plaintiff made that comment, Dr. Duboys' demeanor changed, and he ended the interview.

40. Later that day, Plaintiff messaged two other applicants to the Program – one male and one female – who had also interviewed on April 10, 2021, with Dr. Duboys. Plaintiff informed

them of what transpired and about Dr. Duboys sexually harassing her. Plaintiff also asked whether he made similar comments to them or asked to view any part of their body.

41. Eric Forney, the male applicant, responded that no, "he [Dr. Duboys] did not ask me anything like that." However, in contrast, Amanda Fazzalari, the female applicant had received similar comments from Dr. Duboys.

42. While ending the Zoom interview, Dr. Fazzalari thanked Dr. Duboys and stated that she looked forward to seeing him in the future. Dr. Duboys replied stating, "In person or maybe only torso up," and "made a hand gesture" to demonstrate that he was referring to the "waist up."

43. After Plaintiff's April 10, 2021, interview with the Program and Dr. Duboys, during which she refused to accede to Dr. Duboy's advances, doctors affiliated with the Program changed their stance regarding Plaintiff's application and no longer assured her that she was a top candidate for the residency program.

44. For example, on or about April 11, 2021, after Plaintiff's interview with Dr. Duboys, Plaintiff spoke with Dr. Yamin. In an abrupt shift from prior conversations, Dr. Yamin suggested that Plaintiff "may get bumped out" and needed to "do a little more" and "express your [her] interest."

45. Despite the sexual harassment to which Dr. Duboys subjected Plaintiff, Plaintiff ultimately ranked the program as her first choice among the eight programs she interviewed with because Dr. Simpson and other doctors affiliated with the Program informed Plaintiff that she was one of the top five applicants and provided positive feedback regarding her residency application and candidacy. Additionally, Plaintiff ranked the program highly because she had completed an away rotation at the Program, increasing her chances of matching at the Program.

46. Plaintiff was also interested in the program due to its proximity near her family members and relatives.

47. On May 11, 2021, Plaintiff learned that the Program did not select her application and that she did not match with the program, despite previous statements from program doctors that she was a top applicant and having successfully completed one month away rotation at the Program.

48. Upon information and belief, Dr. Simpson ranked Plaintiff as one of the top 5 of all applicants prior to her interview with the Program. Additionally, after the interview, Dr. Simpson ranked Plaintiff 15th of all applicants, a clear drop from his previous rankings.

49. Upon information and belief, Dr. Duboys also ranked Plaintiff as his second choice for one of the two residency positions.

50. Plaintiff's qualifications did not change after her interview with Dr. Duboys and the Program doctors. the only thing that changed was her refused to accede to Dr. Duboys' sexual harassment.

51. That year the Program ultimately offered the two open residency positions to two men for the 2022 cycle.

52. That same year, in 2021, Plaintiff was also interviewed at the University of Alabama at Birmingham. During said interview, Dr. Jorge De la Torre, the program director, mentioned that he had trained under Dr. Simpson and that the two were "in touch." Plaintiff also did not receive an offer from and did not match with the Alabama program.

53. On or about May 11, 2021, Plaintiff emailed Dr. Simpson to inquire into whether her application had any errors or red flags that caused her not to match. Shortly thereafter, Dr.

Simpson responded that he was surprised that Plaintiff had not matched and that there was nothing that needed improvement in Plaintiff's application.

54. Due to Dr. Duboys' and the LNS Program's sexual harassment, discrimination, and retaliation, Plaintiff did not match for any surgery residency positions in 2021.

55. Other residency programs were aware of Plaintiff's connection to the LNS Program and would have reasonably expected Plaintiff to rank the LNS program as her first choice, which she did.

56. Plaintiff invested substantial amounts of time, effort, and resources in developing a relationship with the LNS Program and its doctors, having completed a one-month away rotation at the Program and having received a recommendation letter from Dr. Simpson.

57. During at least two residency interviews, attending doctors remarked to Plaintiff that the LNS program "must really like" her, indicating that they expected Plaintiff to match with the LNS Program. One program explicitly stated to Plaintiff that it typically ranks highest applicants who have completed an away rotation with the program. In light of this, there were clear indicators to other programs that Plaintiff would seek to match with the LNS Program and vice versa.

58. Further, by ranking the LNS Program as her first choice, Plaintiff was unable to rank other programs in that first slot. As a result, certain programs may have matched with candidates whom the programs had ranked lower than they had ranked Plaintiff solely because Plaintiff ranked the LNS Program as her number one choice, because of the investments she made in the Program, and because of the reassurances regarding the strength of her candidacy Plaintiff received from doctors at the Program.

59. Without an available plastic surgery residency position, Plaintiff had to seek out other opportunities for 2022 – 2023. Plaintiff ultimately accepted a one-year burn surgery fellowship with the University of Chicago. Plaintiff resolved to reapply for plastic surgery residencies again during the 2021 – 2022 application cycle.

60. As a result of not matching during the 2020 – 2021 application cycle, Plaintiff's medical and plastic surgery career was delayed by at least one year.

61. On May 20, 2021, Plaintiff sent a complaint to the Accreditation Counsel for Graduate Medical Education (ACGME) about Dr. Duboy's sexual harassment and asked to proceed anonymously. The ACGME responded that it could not proceed anonymously, and that Plaintiff should contact the Program directly.

62. On June 1, 2021, Plaintiff filed a formal complaint of sexual harassment with NUMC. Dr. Robert Yost, the Dean of Academic Affairs at NUMC, responded that the Program takes such complaints "very seriously" and would "conduct a full investigation."

63. However, Plaintiff never received a response regarding any investigation and received no further responses from Dr. Yost or anyone else affiliated with the Program.

64. In the fall of 2021, Plaintiff reapplied to residency programs during the 2021–22 application cycle. Again, the Program retaliated against her.

65. On December 9, 2021, Plaintiff reached out to Dr. Simpson to express her interest in again applying for residency. Despite previously serving as her recommender, Dr. Simpson refused to even respond to Plaintiff's communication.

66. As noted above, Dr. Simpson had previously served as Plaintiff's recommender for the 2021 application cycle. However, Dr. Simpson now refused to even respond to Plaintiff's message.

67. Plaintiff received the same treatment from the University of Alabama—a program with a clear connection to the LNS Program. As discussed above, the Alabama program's director, Dr. De la Torre, explicitly told Plaintiff in 2021 that he was "in touch with Dr. Simpson," having trained under him. Plaintiff emailed Dr. De la Torre in late 2021 to express her interest in applying to Alabama during the upcoming match cycle. Dr. De la Torre, similar to his mentor, Dr. Simpson, never responded to Plaintiff's email.

68. Notably, in the 2021–22 cycle Plaintiff received interviews with many of the most prestigious plastics residencies in the country. However, Plaintiff was not selected to interview with the less-competitive LNS Program.

69. Notwithstanding Drs. Simpson's and De la Torre's lack of response, Plaintiff received more interviews with residency programs in 2022 (ten) than she had in 2021 (eight). Further, many of the 2022 interviews were with the most prestigious residency programs in the country, such as the University of Pennsylvania, University of Indiana, Cleveland Clinic Florida, and University of California San Francisco. However, Plaintiff did not receive an interview invitation to the less competitive LNS and Alabama Programs.

70. Out of all the active residency programs Plaintiff interviewed with in 2021, all but the LNS Program and the University of Alabama program invited Plaintiff back to interview in 2022.

71. Plaintiff ultimately matched with the Chattanooga program, where she began in the summer of 2023.

72. The conduct of LIPSG, NUMC, and SUNY towards Plaintiff constitutes unlawful sexual harassment, gender discrimination, and retaliation. Their illegal harassment, discrimination,

and retaliation have delayed Plaintiff's career, caused Plaintiff significant financial harm, and caused Plaintiff significant emotional distress.

73. Defendants' conduct is a part of a larger pattern of bias within the medical and plastic surgery fields as noted by social scientific research. [1] However, the LNS Program consistently ranked lower than the national average with respect to its underrepresentation of women surgeons hired for its residency programs and in other hiring practices.

74. For example, while seventeen percent ("17%") of all plastic surgeons in the United States are women, only two ("2") of the twenty ("20") plus attending surgeons employed by LIPSG during the 2020 – 2021 hiring cycle were women. Further only one ("1") of the twelve ("12") independent and integrated LNS Program residents were female during the 2020-2021 application cycle; both figures are well below 10%, despite the national representation of women plastic surgeon being double of that of the Program.

## AS A *FIRST* CAUSE OF ACTION FOR DISCRIMINATION UNDER TITLE VIII OF THE CIVIL RIGHTS ACT OF 1964

75. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

76. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1) provides in pertinent part, that:

> "It shall be an unlawful employment practice for an employer to … discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or

---

[1] Julian E. Karamanos *et al*, *Gender Bias in the Integrated Plastic Surgery Residency: A Snapshot of Current Trends*, 8:1 PLAST RECONSTR SURG GLOB OPEN (2020).
 Cooney CM, Aravind P, Hultman CS, Broderick KP, Weber RA, Brooke S, Cooney DS, Lifchez SD. An Analysis of Gender Bias in Plastic Surgery Resident Assessment. J GRAD MED EDUC. 2021 Aug;13(4):500-506.
Catenaccio E, Rochlin JM, Simon HK. Addressing Gender-Based Disparities in Earning Potential in Academic Medicine. JAMA NETW OPEN. 2022;5(2):e220067. doi:10.1001/jamanetworkopen.2022.0067

national origin."

77. Plaintiff is a member of a protected class in that she is a woman.

78. Defendant engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e *et seq.*, by discriminating against Plaintiff because of her sex/gender.

79. Defendants subjected or allowed Plaintiff to be subjected to unlawful sexual harassment and discrimination on the basis of her sex by subjecting Plaintiff to unwanted sexual advances and leering, humiliation, retaliation, and treating Plaintiff differently than male applicants to the Program.

80. Defendants also subjected Plaintiff to adverse employment actions, including but not limited to retaliation, based on her sex/gender and because she complained of the sex discrimination to which she was subjected.

81. As a result of Defendants' actions, Plaintiff was humiliated, degraded, victimized, emotionally distressed, denied opportunities, and caused to suffer monetary loss and damages.

82. As a result of the acts and conduct complained of herein, Plaintiff has suffered emotional pain, inconvenience, wrongful exclusion, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

83. Defendants' conduct was malicious, willful, and conducted with full knowledge of the law.

84. Plaintiff is entitled to the maximum amount allowed under this statute/law.

### AS A *SECOND* CAUSE OF ACTION FOR RETALIATION UNDER TITLE VIII OF THE CIVIL RIGHTS ACT OF 1964

85. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

86. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 42 U.S.C. § 2000e-3(a) provides in pertinent part, that:

> "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

87. Plaintiff is a member of a protected class in that she is female. Plaintiff engaged in protected activity by opposing and reporting her sexual harasser to the Program and by filing an EEOC Charge of Discrimination relating to the same.

88. Plaintiff suffered adverse action in that she was not selected for a residency position and did not match due to Defendants' retaliation against her, as described above.

89. As a result of Defendants' actions, Plaintiff was humiliated, degraded, victimized, emotionally distressed, denied opportunities, and caused to suffer monetary loss and damages.

90. As a result of the acts and conduct complained of herein, Plaintiff has suffered emotional pain, inconvenience, wrongful exclusion, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

91. Defendants' conduct was malicious, willful, and conducted with full knowledge of the law.

92. Plaintiff is entitled to the maximum amount allowed under this statute/law.

### AS A *THIRD* CAUSE OF ACTION FOR DISCRIMINATION UNDER TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

93. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

94. Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. ("Title IX"), which provides, in pertinent part, that:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance..."

95. Plaintiff is a member of a protected class in that she is a woman.

96. The aforementioned acts of Defendants against Plaintiff constitute unlawful discrimination on the basis of sex against Plaintiff in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. ("Title IX"), which applies to residency programs and residency applications. *See Castro v. Yale Univ.*, 518 F. Supp. 3d 593, 597 (D. Conn. 2021) (teaching hospitals and residency programs are subject to Title VII and Title IX); *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 106 (2d Cir. 2022) (Title IX provides for claims of employment discrimination).

97. Defendants violated Title IX by allowing Plaintiff to be subjected to unlawful sexual harassment, discrimination, and by retaliating against Plaintiff after she rebuffed and refused to accede to her harasser's demands and unwanted sexual advances.

98. As a direct and proximate result of Defendants violation of Title IX, Defendants are liable to Plaintiff for money damages and, pursuant to 42 U.S.C. §1988, reasonable attorney's fees and costs.

### AS A *FOURTH* CAUSE OF ACTION
### FOR RETALIATION
### UNDER TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 and 34 C.F.R §106.71

99. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

100. 34 C.F.R §106.71 provides in pertinent part, that:

"No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX or this part, constitutes retaliation. The recipient must keep confidential the identity of any individual who has made a report or complaint of sex discrimination, including any individual who has made a report or filed a formal complaint of sexual harassment, any complainant, any individual who has been reported to be the perpetrator of sex discrimination, […]"

101. Plaintiff is entitled to the protection of the above - referenced statutes which prohibit retaliation because she engaged in protected activity by reporting her harassment to the LNS Program.

102. Defendants are covered by Title IX in that they receive federal funding for education programs, *inter alia*.

103. Plaintiff was, at all relevant times, a prospective employee whom Defendants retaliated against after she reported her sexual harasser, by not selecting her residency application and ranking her lower than she would have been ranked if not for Plaintiff reporting her sexual harasser, *inter alia.*

104. The aforementioned acts of Defendants against Plaintiff constitute unlawful retaliation in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. ("Title IX"), which applies to residency programs and residency applications. *See Castro v. Yale Univ.*, 518 F. Supp. 3d 593, 597 (D. Conn. 2021) (teaching hospitals and residency programs are subject to Title VII and Title IX); *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 106 (2d Cir. 2022) (Title IX provides for claims of employment discrimination).

105. Defendants violated Title IX by subjecting Plaintiff to unlawful retaliation after she rebuffed and refused to accede to her harasser's demands and unwanted sexual advances.

106. As a direct and proximate result of Defendants violation of Title IX, Defendants are liable to Plaintiff for money damages and, pursuant to 42 U.S.C. §1988, reasonable attorney's fees and costs.

### AS A *FIFTH* CAUSE OF ACTION
### FOR DISCRIMINATION
### UNDER THE NEW YORK STATE HUMAN RIGHTS LAW §296

107. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

108. New York State Executive Law § 296(1)(a) provides that, "It shall be an unlawful discriminatory practice for an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, …. to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

109. Plaintiff is a member of a protected class in that she is a woman.

110. As described above, Defendants engaged in unlawful employment practices by discriminating against Plaintiff solely based on her gender and by retaliating against Plaintiff for engaging in protected activity.

111. Plaintiff was the victim of sexual harassment, discrimination, unwanted sexual advances, inappropriate sexual comments, humiliation, wrongful accusations of misconduct, abuse, retaliation, and adverse employment actions based solely on her sex/gender.

112. Because of the acts and conduct complained of herein, Plaintiff has suffered emotional pain, mental distress, suffering, inconvenience, loss of enjoyment of life, and other pecuniary and non-pecuniary loss.

113. Defendants' conduct was willful, malicious, outrages, and conducted with full knowledge of the law.

114. Plaintiff is entitled to the maximum allowed under this statute and any other applicable laws.

## AS A SIXTH CAUSE OF ACTION
## FOR RETALIATION UNDER THE NEW YORK STATE
## HUMAN RIGHTS LAW § 296

115. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

116. Executive Law § 296, in pertinent part, provides that:

> "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article."

117. Defendants engaged in unlawful discriminatory practices by discriminating and retaliating against Plaintiff because of her opposition to the unlawful employment practices of the Defendants, including opposing her sexual harasser and Defendants' discrimination.

118. Because of the acts and conduct complained of herein, Plaintiff has suffered emotional pain, mental distress, suffering, inconvenience, loss of enjoyment of life, and other pecuniary and non-pecuniary loss.

119. Defendants' conduct was willful, malicious, outrages, and conducted with full knowledge of the law.

120. Plaintiff is entitled to the maximum allowed under this statute and any other applicable laws.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests a judgement against the Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by **Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and the New York State Human Rights Law,** in that Defendant discriminated against Plaintiff on the basis of her sex (female) by subjecting Plaintiff to sexual harassment, discrimination, and retaliation by failing to select Plaintiff or rank her highly enough to be matched for a residency program, *inter alia*;
B. Awarding damages to Plaintiff for all lost wages and benefits, past and future, back pay and front pay, resulting from Defendants' unlawful employment practices, and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;
C. Awarding Plaintiff compensatory damages related to injuries suffered as per Plaintiff's State-law claims;
D. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;
E. Awarding Plaintiff punitive damages;
F. Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;
G. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Dated: Bellport, New York
December 30, 2024

                                                **MESIDOR PLLC**
                                                **ATTORNEYS AT LAW**

                                  By: /s/_____
                                                Marjorie Mesidor
                                                Itohen Ihaza
                                                **Mesidor, PLLC**
                                                *Attorneys for Plaintiffs*
                                                600 Fifth Avenue, 2nd Floor
                                                New York, New York 10020

T: (212) 784-6269
mm@marjoriemesidor.com